UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THE MASHANTUCKET | : | |
| PEQUOT TRIBE, | : | |
|     Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:02-cv-1828 (JCH) |
| | : | |
| RAYMOND REDICAN, JR. d/b/a | : | |
| CBNO FOXWOOD.COM (CIS), | : | |
|     Defendant. | : | MARCH 18, 2004 |

**RULING DENYING
DEFENDANT'S MOTION TO DISMISS [Dkt. No. 32]**

The plaintiff, the Mashantucket Pequot Tribe ("Tribe") brings this trademark action

against the defendant, Raymond Redican, Jr. d/b/a CBNO FOXWOOD.COM (CIS)

("Redican"), alleging various violations of federal and state trademark law, including the

Anticybersquatting Consumer Privacy Act ("ACPA"), see 15 U.S.C. §§ 1114, 1125,[1] and

---

[1]     A domain name is a unique string of characters or numbers that typically is used to designate and permit access to an Internet website. The widespread use of domain names in recent years has been accompanied by a phenomenon known as "cybersquatting," which involves the registration as domain names of well-known trademarks by non-trademark holders who then try to sell the names back to the trademark owners. Since domain name registrars do not check to see whether a domain name request is related to existing trademarks, it has been simple and inexpensive for any person to register as domain names the marks of established companies. This prevents use of the domain name by the mark owners, who not infrequently have been willing to pay "ransom" in order to get "their names" back. In order to combat such bad-faith registration or use of domain names, Congress has enacted the Anticybersquatting Consumer Protection Act (ACPA) as a supplement to the federal trademark statute. The ACPA applies to all domain names registered before, on, or after the date of enactment, November 29, 1999. Pub. L. No. 106-

of the Connecticut Unfair Trade Practices Act, <u>see</u> Connecticut General Statutes § 42-110a <u>et</u> <u>seq</u>.  <u>See</u> Complaint [Dkt. No. 1].  The Tribe's claims are based on its allegations that Redican registered the domain names FOXWOOD.ORG and FOXWOOD.COM, among others; operated a website using the latter domain name which offered advertisements and enabled website users to access the websites of on-line casinos and marketers merely by clicking on an icon; and ultimately made unsuccessful efforts to sell his domain name registrations to the Tribe.

Redican has moved to dismiss the complaint against him, claiming that the court lacks personal jurisdiction over him.  <u>See</u> Defendant's Motion to Dismiss for Lack of Personal Jurisdiction [Dkt. No. 32].  For the reasons stated below, the court concludes that it can assert personal jurisdiction over Redican and therefore denies the motion.

## I.    FACTS AND PROCEDURAL HISTORY

The Tribe is a federally recognized Indian tribe located in Mashantucket, Connecticut.  The Tribe owns and operates the Foxwoods Resorts and Casino, which first opened in 1992, and is perhaps the largest casino in the world.  "Foxwoods" is the subject of United States trademark registrations not only for casino services but also, <u>e.g.</u>,

---

113 tit. III § 3010, 113 Stat. 1501, 1501A-552 (1999).

<u>Mattel, Inc. v. Barbie-Club.com</u>, 310 F.3d 293, 295 (2d Cir. 2002) (case in which plaintiff could not sue <u>in</u> <u>personam</u> and therefore sought to avail itself of the <u>in</u> <u>rem</u> provisions of the ACPA, which permit the owner of a mark to bring suit directly against a domain).

newsletter publications, apparel, retail apparel stores, hotel accommodations, and restaurant operations.

Defendant Redican, who is a citizen of Massachusetts, does business under the names CBNO FOXWOOD.COM (CIS). Redican has registered over fifty domain names, including the registrations of FOXWOOD.ORG and FOXWOOD.COM,[2] which were registered in 1997.[3] Redican identified the registrant of the FOXWOOD.COM domain

---

[2] The court notes that, unlike the Tribe's trademark Foxwoods, Redican's domain names do not have the letter "s" at the end of the word.

[3] By way of further explanation of the technical terms in this Ruling, the court offers the following excerpt from Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316 (9th Cir. 1998):

> The Internet is a worldwide network of computers that enables various individuals and organizations to share information. The Internet allows computer users to access millions of web sites and web pages. A web page is a computer data file that can include names, words, messages, pictures, sounds, and links to other information.
>
> Every web page has its own web site, which is its address, similar to a telephone number or street address. Every web site on the Internet has an identifier called a "domain name." The domain name often consists of a person's name or a company's name or trademark. For example, Pepsi has a web page with a web site domain name consisting of the company name, Pepsi, and .com, the "top level" domain designation: Pepsi.com.
>
> The Internet is divided into several "top level" domains: .edu for education; .org for organizations; .gov for government entities; .net for networks; and .com for "commercial" which functions as the catchall domain for Internet users.
>
> Domain names with the .com designation must be registered on the Internet with Network Solutions, Inc. ("NSI"). NSI registers names on a first-come, first-served basis for a $ 100 registration fee. NSI does not make a determination about a registrant's right to use a domain name. However, NSI does require an applicant to represent and warrant as an express condition of registering a domain name that (1) the applicant's statements are true and the applicant has the right to use the requested domain name; (2) the "use or registration of the domain name . . . does not interfere with or infringe the rights of any third party in any jurisdiction with respect to trademark, service mark, trade name, company

name as "Foxwood On-line Casino Inc." and gave his own name as the administrative and

billing contact.  Based on the evidence before the court, the website, which is no longer an

active site on the Web, offered advertising and allowed its users to access on-line casinos

and marketers merely by clicking on various icons.  According to Redican, the site's

advertising alone generated from $600 to $1000 per year, and Redican testified that his

website had three times the number of hits than that generated by the Tribe's official

website, Foxwoods.com.[4]

In April or May of 2001, as part of effort to sell his Foxwood domain name

registrations, Redican contacted more than fifty Foxwood organizations.  Redican

_____

name or any other intellectual property right"; and (3) the applicant is not seeking to use the
domain name for any unlawful purpose, including unfair competition.
    A domain name is the simplest way of locating a web site.  If a computer user does
not know a domain name, she can use an Internet "search engine."  To do this, the user
types in a key word search, and the search will locate all of the web sites containing the key
word. Such key word searches can yield hundreds of web sites.  To make it easier to find
their web sites, individuals and companies prefer to have a recognizable domain name.

Id. at 1318-19.


[4] Redican's testimony was not precise with respect to actual dollar amounts earned as a
result of the existence of the website.  With respect to the hyperlink activity, he explained that with
some advertisers, such as Valueclick, the website earned "between two and eight cents [] every time
[a user] click[s] on the ad."  See Plaintiff's Memorandum in Opposition to Defendant's Motion for
Dismissal for Lack of Personal Jurisdiction, ("Pl's Mem.") [Dkt. No. 37], Ex. A: Redican Dep. at
30.  He said another advertiser, Commission Junction "works on a percentage of sale.  So that's how
that works.  . . . [I]f someone ends up advertising with them, they'll split it 50/50.  They get like
$2,000.  I'll get $1,000."  See Pl's Mem., Ex. A: Redican Dep. at 31.

succeeded in selling at least two domain names unrelated to Foxwood(s), one of which sold for $850 and the other selling for $1,750. See Plaintiff's Memorandum in Opposition to Defendant's Motion for Dismissal for Lack of Personal Jurisdiction, ("Pl's Mem.") [Dkt. No. 37], Ex. A: Redican Dep. at 45.

As part of his effort to sell the Foxwood registrations, Redican traveled to Mashantucket, Connecticut and visited the Tribe in order to arrange a meeting with tribal executives about selling the domain name. During this visit, Redican obtained the names of two tribal officials he was to speak to about domain names. On May 5, 2001, Redican called these officials in order to arrange a meeting but was told he had to make a request in writing. On May 11, 2001, Redican mailed a letter requesting a meeting. On June 5, 2001, he telephoned the Tribe to follow up on his previous letter. In response, on August 10, 2001, Redican received letters from the Tribe's legal counsel demanding assignment of the domain name registrations. On March 9, 2002, Redican made a second visit to Mashantucket and met with a member of the Tribe's public relations department.[5] At points in his attempts to sell the domain names, Redican sought $20 million and later offered $3.5 million in exchange for the registrations. See Pl's Mem. at 4.

---

[5] The Tribe also notes that "[i]n addition to these visits in which he attempted to sell the domain name registrations, Mr. Redican obtained a Wampum Card issued to frequent patrons of the Casino, and his card account shows 1 visit in 1999, 4 visits in 2000, 3 visits in 2001, and 24 visits in 2002 . . . , [in addition to a loss of] $3,769." Pl's Mem. at 4. The court's decision does not rely on these facts.

On October 17, 2002, the Tribe filed a complaint against Redican alleging trademark infringement under federal law and state common law, federal and state trademark dilution, false designation or description, and violations of the Anticybersquatting Act, see 15 U.S.C. §§ 1114, 1125, and of the Connecticut Unfair Trade Practices Act, see Connecticut General Statutes § 42-110a et seq.  The complaint seeks declaratory and injunctive relief as well as monetary damages and attorney's fees and costs.

## II.    DISCUSSION

Redican moves to dismiss for lack of personal jurisdiction on the grounds his conduct does not satisfy the requirements of Conn. Gen. Stat. § 52-59b and, even if it did, the exercise of jurisdiction over him by a Connecticut court would offend notions of "fair play and substantial justice" as articulated in the U.S. Supreme Court's decision in Burger King Corp v. Rudzewicz, 471 U.S. 462, 476 (1985)(quoting International Shoe Co. v. Washington, 326 U.S. 310, 320 (1945)) and its progeny.  See Memorandum of Law in Support of Defendant's Motion to Dismiss for Lack of Personal Jurisdiction ("Def's Mem.") [Dkt. No. 33] at 3-14.  For the reasons that follow, the court disagrees.

On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant.  See Ensign-Bickford Co. v. ICI Explosives USA, Inc., 817 F. Supp. 1018, 1026 (D.Conn. 1993)(Cabranes, J.).

"To survive the motion, the plaintiff must make a 'prima facie showing' through affidavits or other evidence that the defendant's conduct was sufficient for the court to exercise personal jurisdiction." Id. However, "[w]hen, as here, an evidentiary hearing has been conducted, the plaintiff's burden increases such that he must prove jurisdictional facts by a preponderance of the evidence." Milne v. Catuogno Court Reporting Services, 239 F. Supp. 2d 195, 198 (D.Conn. 2002). A defendant's conduct is sufficient for the exercise of personal jurisdiction if (1) the conduct satisfies the requirements of the long-arm statute of the forum state and (2) the conduct satisfies the 'minimum contacts' requirement of the Due Process Clause of the Fourteenth Amendment. Ensign-Bickford Co., 817 F. Supp. at 1026; see also On-Line Techs. v. Perkin Elmer Corp., 141 F. Supp. 2d 246, 262 (D.Conn. 2001)(JBA)(citing Bensmiller v. E.I. Dupont de Nemours & Co., 47 F.3d 79, 81 (2d Cir. 1995)).

Thus, the first issue to be considered is whether Redican's conduct is sufficient to meet the requirements for personal jurisdiction under the Connecticut long-arm statute. The pertinent statute provides in part:

As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident individual . . . , who in person or through an agent: (1) Transacts any business within the state; (2) commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; (3) commits a tortious act outside the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if such person or agent (A) regularly does or solicits business, or engages in any other persistent course of

conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (B) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . . .

Conn. Gen. Stats. § 52-59b. The court concludes that Redican's activities fall within the ambit of Conn. Gen. Stats. § 52-59b(3)(B) because he has committed a "tortious act outside the state" "causing injury . . . within the state" and "he expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate commerce." Id. In reaching this conclusion, the court finds the reasoning adopted in other cases, such as Cello Holdings, L.L.C., v. Lawrence-Dahl Companies, 89 F.Supp. 2d 464 (S.D.N.Y. 2000)(applying identical New York long-arm provision), and National Football League v. Miller, No. 99 Civ. 11846, 2000 U.S. Dist. LEXIS 3929 (S.D.N.Y. March 30, 2000)(applying identical New York long-arm provision), to be persuasive.

In Cello Holdings, L.L.C., v. Lawrence-Dahl Companies, 89 F.Supp. 2d 464, the District Court for the Southern District of New York concluded that the exercise of personal jurisdiction over the defendant was proper pursuant to New York's long-arm statute, which, like its sister provision in Connecticut,[6] provides that the state's courts "may

---

[6] Although the case law interpreting the sister long-arm provisions of Connecticut and New York is not identical, the Supreme Court of Connecticut has suggested that judicial interpretation given to New York's long-arm statute, N.Y.C.P.L.R. § 302, is "pertinent" when interpreting Conn. Gen. Stat. § 52-59b because the Connecticut Legislature used the New York statute as a model

exercise personal jurisdiction over any non-domiciliary . . . who . . . commits a tortious act

without the state causing injury to a person or property within the state . . . if he . . .

expects or reasonably should expect the act to have consequences in the state and derives

substantial revenue from interstate or international commerce." Id. at 470 (citing

N.Y.C.P.L.R. § 302(a)(3)(ii)(McKinney 1997)).  In so concluding, the court noted that

the non-resident defendant had not personally visited New York in thirty years but

nonetheless relied on the fact that the defendant had sent emails to at least nine individuals

or companies attempting to sell the domain name registrations for $4,800; had ultimately

telephoned on two occasions the plaintiff in New York offering to sell the name for $5,000

or in exchange for some equipment and had sent an email to another person in New York

who he thought might be interested in purchasing the domain name; and had offered for

---

when enacting its own long-arm provision. Zartolas v. Nisenfeld, 184 Conn. 471, 474 (Conn. 1981); accord Cody v. Ward, 954 F. Supp. 43, 46 (D.Conn. 1997)("Cases construing New York's tortious act provision would be of interest to the Connecticut Supreme Court but they would not be viewed as controlling.").

The need to analogize is especially compelling in cases like this which involve the Internet, because the case law with respect to personal jurisdiction is still relatively sparse. See generally Millennium Enters., Inc. v. Millennium Music, LP, 33 F. Supp. 2d 907, 914 (D.Or. 1999)("As the Second Circuit has recognized, however, 'attempting to apply established trademark law in the fast-developing world of the Internet is somewhat like trying to board a moving bus . . . .' Bensusan Restaurant Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997).  The court finds the same is true when attempting to apply traditional notions of personal jurisdiction."); see also Miller, 2000 U.S. Dist. LEXIS 3929, *1 ("While millions of people communicate in this way every day, it is doubtful that many of them give any thought to the question of whether their conduct will make them subject to the jurisdiction of a distant court. Yet, this is an issue that the courts have been struggling to resolve on a case-by-case basis.").

sale the domain name in question, along with other domain names he had registered, on a website.  Thus, the court concluded that the defendant had satisfied the "expects or should reasonably expect to have consequences in the state" prong of New York's long-arm statute.  Id. at 470.

The Cello court also concluded that the defendant "derives substantial revenue from interstate and international commerce," although it did so somewhat more tentatively in light of the fact that "the record [was] less clear in this respect" and the fact that the defendant "was somewhat evasive at his deposition."  Id.  In support of this conclusion, the court noted that the defendant had in fact already sold two domain names (for a total of approximately $1,100) and had also sold some equipment in New York, albeit after the filing of the lawsuit.  Id.

The facts of this case are strikingly similar to, if not stronger than, those at issue in Cello, and weigh heavily in favor of the exercise of personal jurisdiction.  As a result of the advertising revenues alone, Redican earns approximately $600 to $1000 per year.  As a result of his efforts to sell various domain name registrations, Redican has earned well over twice the amount earned by the Cello defendant in selling his two domain names, i.e., $2,600.  As was the case in Cello, Redican's deposition suggests that he was, at the very least, uncertain about the earnings he and others received as a result of his website.  See Pl's Mem, Ex. A: Redican Dep. at 24-28, 29-36.  Importantly, unlike the Cello defendant,

Redican did make at least two visits to Connecticut and made multiple attempts, by email or phone, to arrange to meet with officials from the Tribe in order to sell the domain names, and thus had made more traditional, "physical" contacts with the state of Connecticut that were not insubstantial.

Interpreting the same provision of New York's long-arm statute, the District Court for the Southern District of New York in National Football League v. Miller, 2000 U.S. WL 335566 (S.D.N.Y. Mar. 30, 2000), found jurisdiction over a nonresident defendant to be proper in a case involving facts similar to the claims in this case which arise from the operation of Redican's website. The case involved a nonresident defendant who operated a website, registered as "nfltoday.com," which provided users with information about sporting events and allowed them to click on an ad and contact an advertiser, many of which allowed visitors to place sports bets. The site allowed visitors to click on a hyperlink and immediately connect to the official National Football League ("NFL") site, which would then appear in the center of the screen framed by the "nfltoday.com" site. Id. at *1-2. The NFL alleged, among other things, that the website harmed it by linking its trademarks to gambling activity.

The NFL court noted that, although the website "rarely s[old] anything to visitors," the defendant derived substantial income from interstate commerce as a result of advertising revenue. Id. At *2. The NFL court concluded:

11

> In establishing a web site targeting NFL fans, Defendant had to recognize that, since there are two major NFL teams that some people still refer to as the New York Giants and New York Jets even though they play in New Jersey, it was likely that his site would ultimately appear on thousands of computer screens in New York. Defendant must also have recognized that in using the NFL mark to attract people to a site that could pass them on to an electronic bookie, he could do significant damage to the image of the NFL and its marketing efforts in New York. Since he apparently profits substantially from the activity that does damage to the plaintiffs in New York, it does not offend due process to require him to defend his actions in a New York courtroom. . . . What distinguishes this case . . . is that in those cases there was no evidence that the defendants derived substantial income from interstate commerce and it was far from clear that the defendants' conduct substantially injured the plaintiffs in New York.

Id. at *5-6 (citations omitted).

As was the case in Miller, Redican, by establishing a website that allegedly targeted

Foxwoods customers, had to recognize that it was likely that his site would ultimately

appear on computer screens in Connecticut and across the country.  Like the Miller

defendant, Redican also had to realize that, by borrowing the Foxwood(s) trademark, he

could do significant damage to the image of Foxwoods and its marketing efforts in

Connecticut.  This line of reasoning is arguably even stronger in the case of Foxwoods than

the NFL: Foxwoods, as a result of its location in Connecticut, presumably attracts a greater

percentage per population of Connecticut residents than most other states, whereas the

NFL is undeniably a more "national" organization and damage to it might not necessarily

result in more harm to one state than another.  Based on these cases, the court concludes

that the exercise of personal jurisdiction over the person of Redican is authorized by

Connecticut's long-arm statute, specifically Conn. Gen. Stat. § 52-59b(3)(B).

The second step in the analysis involves the question of whether the exercise of personal jurisdiction over Redican would be consistent with his rights under the Due Process Clause of the Fourteenth Amendment.  See, e.g., On-Line Techs. v. Perkin Elmer Corp., 141 F. Supp. 2d 246, 262 (D.Conn. 2001)(JBA)(citing Bensmiller v. E.I. Dupont de Nemours & Co., 47 F.3d 79, 81 (2d Cir. 1995)); Ensign-Bickford Co. v. ICI Explosives USA, Inc., 817 F. Supp. 1018, 1026 (D.Conn. 1993)(Cabranes, J.).  The defendant contends that the exercise of personal jurisdiction over it in this case would violate due process because the defendant does not have "minimum contacts" with the state of Connecticut and because an action against the defendant in this forum would violate traditional notions of "fair play and substantial justice."  See Pl's Mem. at 8-14.

To begin, the court acknowledges the long line of cases in this and other jurisdictions which have already grappled with the thorny questions concerning the exercise of personal jurisdiction in the context of Internet cases.  The court in On-Line Techs. v. Perkin Elmer Corp., 141 F. Supp. 2d 246, 265 (D.Conn. 2001) sought to summarize the case law with respect to personal jurisdiction in Internet cases:

> Courts that have considered the issue of whether web presence creates personal jurisdiction in a particular forum have categorized Internet use into three areas for the purpose of determining whether the exercise of personal jurisdiction is permitted. See VP Intellectual Properties v. Imtec Corp., 1999 U.S. Dist. LEXIS 19700, 53 U.S.P.Q.2D (BNA) 1269 (D.N.J. 1999). At one end of the spectrum are cases where individuals can directly interact with a company over their Internet

13

> site, download, transmit or exchange information, and enter into contracts with the
> company via computer. In such cases, the exercise of jurisdiction is appropriate,
> particularly when combined with evidence of sales from the forum state. See
> CompuServe, Inc. v. Patterson, 89 F.3d 1257 (6th Cir. 1996). At the other end of
> the continuum are cases where the defendant has only advertised on the Internet,
> and where another medium such as the telephone or mail is necessary to contact the
> seller; in the case of such "passive" sites, personal jurisdiction usually does not lie.
> See Bensusan Restaurant Corp. v. King, 937 F. Supp. 295 (S.D.N.Y. 1996). The
> middle ground between the two extremes involves sites where parties can interact
> with the defendant company, but may not be able to contract with the company or
> make purchases over the Internet site; in such situations, most courts follow the lead
> of the Western District of Pennsylvania in Zippo Mfg. Co. v. Zippo Dot Com, Inc.,
> 952 F. Supp. 1119 (W.D. Pa. 1997) and determine whether jurisdiction is proper
> by "examining the level of interactivity and commercial nature of the exchange of
> information that occurs on the Web site." 952 F. Supp. at 1124. See, e.g., Search
> Force v. Dataforce Int'l, 112 F. Supp. 2d 771 (S.D. Ind. 2000) (noting that the
> Fifth, Ninth, and Tenth Circuits have relied upon the analytical framework set out
> in Zippo Mfg. to determine the propriety of exercising jurisdiction based on
> Internet activity).

Id. at 265; see generally Millennium Enters., Inc. v. Millennium Music, LP, 33 F. Supp. 2d

907, 913–923 (D. Or. 1999)(exhaustive discussion of personal jurisdiction analyses in

Internet cases to date).  "[T]he trend has shifted away from finding jurisdiction based solely

on the existence of Web site advertising.  Instead, 'something more' is required to show

that the defendant purposefully directed its activities at the forum."  Millennium Enters.,

Inc. v. Millennium Music, LP, 33 F. Supp. 2d at 915 (citing Cybersell, Inc. v. Cybersell,

Inc., 130 F.3d 414, 418 (9th Cir. 1997)); see also Miller, 2000 U.S. Dist. LEXIS 3929,

*1-2 ("It is now established that one does not subject himself to the jurisdiction of the

courts in another state simply because he maintains a web site which residents of that state

visit. However, one who uses a web site to make sales to customers in a distant state can

thereby become subject to the jurisdiction of that state's courts.")(citing Bensusan

Restaurant Corp., 126 F.3d 25)(other citations omitted).

"A passive Web site that does little more than make information available to those

who are interested in it is not grounds for the exercise personal jurisdiction. Zippo Mfg.

Co. v. Zippo DOT Com, 952 F. Supp. 1119, 1122 (W.D. PA 1997)(citing Bensusan

Restaurant Corp. v. King, 937 F. Supp. 295 (S.D.N.Y. 1996)). Consistent with this

formulation, the court in On-Line Techs. v. Perkin Elmer Corp., 141 F. Supp. 2d 246

(D.Conn. 2001) explained: "At the other end of the continuum are cases where the

defendant has only advertised on the Internet, and where another medium such as the

telephone or mail is necessary to contact the seller; in the case of such "passive" sites,

personal jurisdiction usually does not lie." Id. at 265(citing Bensusan Restaurant Corp.,

937 F. Supp. 295). As the Bensusan court itself observed: "The mere fact that a person

can gain information on the allegedly infringing product is not the equivalent of a person

advertising, promoting, selling or otherwise making an effort to target its product in [the

forum state]."[7] Id. The court concludes that the website operated by Redican was not a

---

[7] The fact that a website is passive does not necessarily dictate a finding of no
jurisdiction, however. "Those courts which have asserted jurisdiction in cases involving
passive Web sites did so because the defendant had additional contacts with the forum
which related to the plaintiff's claim." Millennium Enters., Inc., 33 F. Supp. 2d at 916
(citing Gary Scott International, Inc. v. Baroudi, 981 F. Supp. 714 (D. Mass.
1997)(jurisdiction based on sales of infringing products to Massachusetts retailer in

15

passive site. Although the website could perhaps be properly characterized as an "active website," for purposes of this Ruling, the court need only find that the website falls somewhere in "the middle ground," On-Line Techs., 141 F. Supp. 2d at 265, and taking the record as a whole, find the exercise of jurisdiction to be proper.

Here Redican's website allowed significant interaction by users. The website allowed users to engage in on-line gambling by clicking on a hyperlink, and profited from this hyperlink activity. It likewise earned revenue for Redican by means of advertising, in some cases allowing users to hyperlink to advertiser's sites and receiving a portion of the profits from the sales that resulted. Finally, at times during its operation, the website enabled its visitors to "subscribe" to the website by paying a subscription fee. See Pl's Mem., Ex H: Foxwood Registration page.

The combination of this website interactivity and the more traditional contacts made by Redican with the state of Connecticut compel a finding that the exercise of personal jurisdiction is proper here.[8] This court follows the approach espoused in

---

addition to Web site advertising); Heroes, Inc. v. Heroes Foundation, 958 F. Supp. 1, 3-5 (D.D.C. 1996) (jurisdiction based on Web site and advertisement in local newspaper soliciting donations)).

[8] In doing so, the court acknowledges that:

Courts have reached differing conclusions with respect to those cases falling into the middle "interactive" category identified in Zippo. As declared by one commentator, the "current hodgepodge of case law is inconsistent, irrational, and irreconcilable." Howard B. Stravitz, "Personal Jurisdiction in Cyberspace: Something More is

16

Mieczkowski v. Masco Corp., 997 F. Supp. 782 (E.D. Tex 1998), where the court

concluded that the defendant's minimal sales in the forum through traditional methods,

along with its interactive Web site, constituted continuous and systematic contacts with the

forum to support the assertion of general jurisdiction in a products liability case. Id. at

787. Notably, the Mieczkowski court explicitly declined to decide "whether standing alone

the Web site maintained by the defendant is sufficient to satisfy a finding of general

jurisdiction." Id. at 788. As previously noted, Redican made a variety of attempts to

consummate a sale which either occurred in or were directed at the state of Connecticut,

including two visits and multiple emails and phone calls to the state. Thus, the nature of

the site, combined with Redican's more traditional types of contacts with the state of

Connecticut, support the conclusion that the exercise of jurisdiction over him would be

proper on these facts.

　　　　Further, courts have found purposeful availment when the claim involves an

intentional tort allegedly committed over the Internet, such that the defendant intentionally

---

　　　　　　Required on the Electronic Stream of Commerce," 49 S.C. L. Rev. 925, 939
　　　　(1998). In these cases, some courts find that an interactive Web site alone is
　　　　sufficient to establish minimum contacts. Others find minimum contacts through
　　　　additional non-Internet activity in the forum, regardless of whether the activity is
　　　　related to the underlying claim. Finally, some courts require additional conduct in
　　　　the forum that is related to the plaintiff's cause of action.

Millennium Enters., Inc., 33 F. Supp. 2d at 916-17.

directed its tortious activities at the forum state.  <u>See</u> <u>Panavision v. Toeppen</u>, 141 F.3d

1316 (9th Cir. 1998)(tortious infringement of trademark where the defendant knew

actions would cause plaintiff harm in forum state); <u>see</u> <u>also</u> <u>Blumenthal v. Drudge</u>, 992 F.

Supp. 44 (D.D.C. 1998) (defamatory statements on Internet site); <u>Telco Communications</u>

<u>v. An Apple a Day</u>, 977 F. Supp. 404 (E.D. Va. 1997) (defamatory press releases on

passive Web site); <u>EDIAS Software v. Basis International</u>,  947 F. Supp. 413 (D. Ariz.

1996) (defamatory messages directed at forum).  These cases employ the

"effects test" articulated in <u>Calder v. Jones</u>, 465 U.S. 783, 788-90 (1984), where the

Supreme Court found personal jurisdiction properly asserted over a defendant whose

libelous actions were directed at the plaintiff resident of the forum state. <u>See</u> <u>also</u> <u>Sinatra v.</u>

<u>National Enquirer, Inc.</u>, 854 F.2d 1191, 1195-97 (9th Cir. 1988) (defendant fabricated

elaborate story linking plaintiff's name with a business).

The court finds the Ninth Circuit Court of Appeals' decision in <u>Panavision</u>

<u>International, L.P. v. Toeppen</u>, 141 F.3d 1316, (9th Cir. 1998) to be on point.  In that

case, the Ninth Circuit found the exercise of personal jurisdiction over a cybersquatting

defendant to be proper.[9]

---

[9] The court analyzed only the due process issue because the relevant long-arm
statute, that of California, <u>see</u> Cal. Civ. Pro. Code § 410.10, permits courts to exercise
personal jurisdiction to the full extent permitted by the Fifth Amendment of the United
States Constitution.  <u>Cf.</u>, <u>e.g.</u>, <u>Thomason v. Chemical Bank</u>, 234 Conn. 281, 293 600-01
(Conn. 1995)("Our precedents also establish, however, that the legislature did not intend
to authorize Connecticut courts to exercise the full measure of "general" jurisdiction that

In <u>Panavision</u>, as in this case, the defendant registered established trademark names as domain names for his Web sites, then attempted to "sell" the rights to the domain name to the holder of the trademark, at one point asking for $13,000. 141 F.3d at 1319, 1322. The defendant argued that he had no contacts with the forum state, because he had not directed any activity toward or entered the state.  The Ninth Circuit disagreed:

> We agree that simply registering someone else's trademark as a domain name and posting a web site on the Internet is not sufficient to subject a party domiciled in one state to jurisdiction in another.  <u>Cybersell</u>, 130 F.3d at 418.  As we said in <u>Cybersell</u>, there must be "something more" to demonstrate that the defendant directed his activity toward the forum state. <u>Id.</u>  Here, that has been shown. Toeppen engaged in a scheme to register Panavision's trademarks as his domain names for the purpose of extorting money from Panavision. His conduct, as he knew it likely would, had the effect of injuring Panavision in California where Panavision has its principal place of business and where the movie and television industry is centered.  Under the "effects test," the purposeful availment requirement necessary for specific, personal jurisdiction is satisfied.

<u>Id.</u> at 1322.  This is the situation before the court in this case, at least on the record established to date.  <u>See also</u> <u>Quokka Sports, Inc. v. Cup Int'l Ltd.</u>, 1999 U.S. LEXIS 21000, at *10-23, No. C-99-5076 (N.D. Cal. Dec. 13, 1999)(exercising personal jurisdiction over New Zealand defendants who operated a website under domain name "americascup.com," where defendants "purposely availed" themselves of benefits of conducting activities in United States and targeted U.S. market by "purposefully interjecting their website into the California and United States markets"); <u>Hasbro, Inc. v.</u>

---

would have been constitutionally permissible.")

Clue Computing, Inc., 994 F. Supp. 34 (D. Mass. 1997)(exercising personal jurisdiction over Colorado corporation that operated a website, "clue.com," that allegedly diluted trademark of Massachusetts company, where the website was targeted to reach a national audience, the website was accessible to Massachusetts residents, the company listed a Massachusetts company as a client, and the company represented that its employees would travel anywhere).

Finally, after the court determines whether the minimum contacts component of the due-process inquiry has been satisfied, the second stage of the due-process inquiry asks whether the assertion of personal jurisdiction comports with traditional notions of fair play and substantial justice, that is, whether it is reasonable under the circumstances of the particular case.  See Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 568 (2d Cir. 1996).  The court must evaluate "the following factors as part of this reasonableness analysis: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies."  Id.

In weighing these factors, the court concludes that all of the factors, with the possible exception of the first, suggest that the action should take place in Connecticut.  In

fact, factors two and three weigh heavily in favor of Connecticut jurisdiction. The only viable argument Redican makes against the exercise of jurisdiction in Connecticut is that he is unemployed and recently disabled and thus would find it burdensome to make the three hour trip from his home in Lowell, Massachusetts to Bridgeport, Connecticut. Def's Mem. at 12-14. He contrasts his situation with that of the Tribe, which he describes as "an extremely profitable entity [that] has made no allegation that it will encounter any special difficult in traveling to or being represented in Massachusetts." Id. at 13. In light of the other four factors, the court concludes that Redican's argument is insufficient to justify the conclusion that haling Redican into Connecticut court violates fair play and substantial justice under the Fifth Amendment. Thus, the court concludes that requiring Redican to face suit in Connecticut will not violate "fair play and substantial justice" as articulated in the U.S. Supreme Court's decision in Burger King Corp v. Rudzewicz, 471 U.S. 462, 476 (1985)(quoting International Shoe Co. v. Washington, 326 U.S. 310, 320 (1945)) and its progeny.

Therefore, as a result of the foregoing analysis, the court concludes that the exercise of personal jurisdiction over Redican comports with notions of due process and is properly authorized by Connecticut's long-arm statute.

## III.    CONCLUSION

For all of the aforementioned reasons, the defendant's motion to dismiss [Dkt. No.

32] is DENIED.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 18th day of March, 2004.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge