UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THE MASHANTUCKET | : | |
| PEQUOT TRIBE, | : | |
| Plaintiff | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:02-cv-1828 (JCH) |
| | : | |
| RAYMOND REDICAN, JR. d/b/a | : | |
| CBNO FOXWOOD.COM (CIS), | : | |
| Defendant | : | NOVEMBER 21, 2005 |

**MEMORANDUM OF DECISION**

The Mashantucket Pequot Tribe ("Mashantucket") has sued Raymond R.

Redican, Jr., d/b/a CBNO Foxwood.com (CIS) ("Redican") seeking injunctive relief for

trademark infringement, unfair competition, trademark dilution, and cybersquatting.

Redican denies these claims.  Mashantucket seeks injunctive relief, precluding Redican

from using their mark, FOXWOODS, in any manner and from continuing any activities

on foxwood.com.  Mashantucket also seeks transfer of the registrations of the domain

names foxwood.com and foxwood.org pursuant to 15 U.S.C. § 1125(d)(1)(C).

The case was tried to the court on August 29, 2005. The court's findings of fact

and conclusions of law are set forth below.

I.    **Findings of Fact**

On the basis of the testimony and exhibits, the court finds the following:  Redican

does business under the names CBNO FOXWOOD.COM (CIS) and Commonwealth

Internet Services (CIS).  On May 22, 1997, a representative of Global Communications

Internet Working Corporation registered the domain name foxwood.com for Redican.

He formerly, but no longer, controls the domain name registrations for foxwood.org. or

1

foxwood.net.  Redican presently maintains a website at foxwood.com providing cultural, historical, tourism, and demographic information related to towns, communities, individuals, and other items which contain in their name the word, "Foxwood."  Redican allows advertisers to provide links from this website to the advertisers' websites.  He derives income from the placement of such advertisements.  At least as late as June 2002, the foxwood.com website included advertising icons and hyperlinks to gambling sites.  Redican has since that time opted out of the placement of gambling-related advertising on his website.  He continues, however, to allow advertisers to place hyperlinks to advertisers' websites on foxwood.com.

Redican has received compensation from various companies who place advertisements on websites on behalf of their client companies.  Redican has arranged that the income from advertisers on the website foxwood.com is paid to persons designated by, and known to, him, including Michael Whiting, Paula Saing and Christopher Caron.  After obtaining the domain name of foxwood.com, Redican sought to obtain a federal trademark registration of foxwood.com on August 16, 1999.  His application was rejected for, among other reasons, the likelihood of confusion with the mark Foxwood and the application was abandoned. Plf. Ex. 22-8.  While Redican's purported reason for obtaining the foxwood.com domain name was in connection with the project of building a community of Foxwood-named community interests sites, Redican's other domain name registrations are of actual cities and towns in Massachusetts and New Hampshire, e.g., Haverhill.com, Dracut.com, Tyngsboro.com. Foxwood.com is the only one which purports to apply to a multiple number of communities or things bearing the same name.

2

The Mashantucket Pequot Tribe is the sole owner of a casino and entertainment complex in southeastern Connecticut.  The casino opened in 1992.  Tr. at 21.  It has adopted the name Foxwoods for its casino, resort, and entertainment services and promotes its services under the trade names and service marks FOXWOODS, FOXWOODS CASINO, and FOXWOODS RESORT CASINO.  Mashantucket has had federal service mark and trademark registrations of FOXWOODS for various services and products from at least 1995.  See Ex. 1, 2, 5, 6, 7 & 8.  Mashantucket has registered a number of domain names to market its services.  These include foxwoods.com, foxwoodscasino.com, pequotcasino.com, and mashantucket.org.  The foxwoods website is important to Mashantucket marketing operations.

The trademark FOXWOODS is famous for casino and resort services. Mashantucket invests significant resources in marketing and community relations.  In the past three years, all advertising media expense has exceeded $26 million, and the total marketing expense is several multiples of that figure.  Mashantucket's websites are important to its marketing efforts.  Mashantucket uses its sites to advertise available services, to allow consumers to book hotel rooms, make restaurant reservations, and purchase other goods and services, and to offer promotions and discounts to customers.  Mr. DiSalvio, Foxwoods' Executive Vice President for marketing, testified that in the month of July 2005, foxwoods.com had 12 million hits, Tr. at 12, that Foxwoods had a well-recognized international brand name, Tr. at 32, and that "40,000 people a day go through the door" of the Foxwoods casino, Tr. at 16.

Redican has visited the Foxwoods facility in Connecticut and engaged in gambling activities on a number of occasions since at least as early as 1999.

3

Redican asserts that he obtained the foxwood-related domain names in connection with a project of building a group of sites related to communities bearing the name foxwood.  Redican testified that he contacted over 50 "foxwood" organizations to determine if there was any interest in purchasing the foxwood.com domain name.  Redican sent communications to various entities, including to Mashantucket on several occasions, seeking to sell the foxwood.com registration.

After reviewing the manner of use and determining whether the use is likely to produce confusion and delete the value of Mashantucket's mark, counsel issues a "cease and desist" letter.  If such letter does not effect termination of the alleged infringing activity, the matter is referred to outside counsel, who will eventually commence litigation if the alleged infringing activity does not cease.

A slight typographical error in seeking Mashantucket's domain name directs an inquiry on the web from Mashantucket's site to Redican's website which, if it features gaming or resort services, can lead and has led persons to believe that Redican's website is part of Foxwoods casino and services operated by Mashantucket.  Inappropriate use of the FOXWOODS mark would decrease its value.  In order to police inappropriate use of their tradename, Mashantucket personnel refer confusing use of the name Foxwoods or similar names to Mashantucket's attorneys.  In August 2001, Mashantucket became aware that internet gaming sites were being promoted on the foxwood.com website of Redican, and further that Redican was attempting to sell his foxwood domain name registration.  In November 1997, Mashantucket's counsel first wrote to Redican to express its objection to the domain name use.  Later, on August 10, 2001, Redican received a letter from Tribal Counsel, Wade Blackmon, demanding

4

transfer of the domain name to Mashantucket.  Redican received a similar letter from outside counsel Peter Costas.  No further action was taken to pursue any claims of infringement until this suit was filed in October 2002.

On June 20, 2002, Redican sent an email to a number of Mashantucket employees offering to sell the foxwood.com website for $19,999,999 and offering a 30% commission to the employee who was able to effect such a sale.  Ten days later, Redican sent another email to William Sebastian offering him $3,500,000 if he could help effect the sale of the domain name registration to Mashantucket for $20,000,000.

Mashantucket received complaints from consumers concerning the foxwood.com site.  Patrons of the casino were confused regarding whether the foxwood.com site was run by Mashantucket.  Mr. Blackmon testified these complaints were one of the reasons he pursued Mr. Redican.  Tr. at 63-64.

Based upon the findings above and the court's assessment of the credibility of Mr. Redican, the court finds that he registered the foxwood.com domain name for the improper purpose of trading upon the famous FOXWOODS trademark of Mashantucket, engaging in activities likely to cause confusion and dilution, and by such activities to coerce Mashantucket to pay an exorbitant amount of money for assignment of a domain name registration.  Foxwood, as used in foxwood.com, is confusingly similar to Mashantucket's registered trademark FOXWOODS, which the court finds was a non-descriptive, well-known mark in 1997 when Redican obtained registration of foxwood.com in the name of Foxwood On-line Casino, Inc.  Redican used that website in a manner relating to casinos and gambling and has since used it in a manner to attempt to profit from the registration and the resulting confusion with foxwoods.com.

5

Redican's original registration of not only the .com site, but also the .org and .net sites for foxwood, is further support for this finding.  In addition, the court finds that there was actually confusion by consumers who accessed the foxwood.com site and thought it was associated with Foxwoods Casino.

## II.    Conclusions of Law

### A.    Counts One, Three, and Five: Trademark Infringement

The owner of a trademark may enforce the right to exclude others from using the trademark in an action for trademark infringement.  Anyone who, without the consent of the owner, uses "any reproduction, counterfeit, copy, or colorable imitation" of a registered trademark in connection with the sale of goods or services in a manner likely to cause confusion, mistake, or deception as to the source of the goods or services infringes the trademark.  15 U.S.C. §1114(1)(a).  The same federal law, known as the Lanham Act, protects unregistered trademarks in a similar manner.  Id. § 1125.

> In order to prevail on a trademark infringement claim for registered trademarks, pursuant to 15 U.S.C. § 1114, or unregistered trademarks, pursuant to 15 U.S.C. § 1125(a)(1), a plaintiff must establish that (1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) "in connection with the sale . . . or advertising of goods or services," 15 U.S.C. § 1114(1)(a), (5), without the plaintiff's consent.  In addition, the plaintiff must show that defendant's use of that mark "is likely to cause confusion . . . as to the affiliation, connection, or association of [defendant] with [plaintiff], or as to the origin, sponsorship, or approval of [the defendant's] goods, services, or commercial activities by [plaintiff]."  15 U.S.C. § 1125(a)(1)(A).

1-800 Contacts, Inc. v. WhenU.Com, Inc., 414 F.3d 400, 406-07 (2d Cir. 2005) (internal case citations omitted).  On Mashantucket's claim for trademark infringement under federal law, it bears the burden of proving the elements set forth above by a

preponderance of the evidence.

To prove that it has a protectable interest in the alleged mark under § 1114(1)(a), Mashantucket must prove that FOXWOODS has been registered as a trademark on the principal register in the United States Patent and Trademark Office and that it is the registrant of that trademark. The court finds that the plaintiff has proven this element.

Next, the court must consider the second threshold matter of whether Redican "used" the FOXWOODS mark within the meaning of the statute. The Lanham Act states that "a mark shall be deemed to be in use in commerce-"

> (1) on goods when--
>> (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
>> (B) the goods are sold or transported in commerce, and
>
> (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

15 U.S.C. § 1127. A court ordinarily finds "use" when a defendant "place[s] the plaintiff's trademark] on any goods or services in order to pass them off as emanating from or authorized by [the plaintiff]." 1-800 Contacts, 414 F.3d at 408.

The Second Circuit has recently held that, under the Lanham Act, use of a website address containing a trademark (in that case, "www.1800contacts.com") is not the same as use of the trademark ("I-800CONTACTS"). Id. at 408. The Second Circuit held that "the differences between the marks are quite significant because they transform 1-800's trademark-which is entitled to protection under the Lanham Act-into a

7

word combination that functions more or less like a public key to 1-800's website." Id.
at 408-09.  The website foxwood.com (which may also be written www.foxwood.com)
differs from the FOXWOODS mark in much the same way as the website
www.1800contacts.com differs from the 1-800CONTACTS mark.  Indeed, the omission
of the "s" from FOXWOODS could even be found to be more significant than the
omission of the hyphen from 1-800CONTACTS, because the absence of the "s"
changes the pronunciation of the word.  Moreover, Redican did not directly use
Mashantucket's foxwoods.com website, but rather the similar website foxwood.com.
Thus, the court concludes that Mashantucket has not proven by a preponderance of the
evidence that Redican infringed upon their trademark in violation of the Lanham Act.

     Mashantucket also asserts trademark infringement under Connecticut common
law.  The court notes a paucity of Connecticut case law on this cause of action.
However, it concludes that Connecticut common law trademark infringement does
require a showing that a trademark owned by the plaintiff has been "used" "in such a
way as to constitute an infringement of the plaintiff's rights in the word."  Hygeia Distilled
Water Co. v. Hygeia Ice Co., 40 A. 534, 541 (Conn. 1898); see Heath v. Micropatent,
1999 WL 1328140, at *5 (Conn. Super. Dec. 30, 1999) (holding that trademark must be
owned by the plaintiff but that unregistered mark does not preclude common law
trademark claim); Republic Oil Co. V. Levy, No. CV94 053 87 57, 1995 WL 94533
(Conn. Super. Feb. 27, 1995) (discussing ownership requirement) ("There is a common
law action for trademark infringement but only one Connecticut case seems to have
discussed this action, Hygeia Distilled Water Co. v. Hygeia Ice Co., 70 Conn. 516
(1898).").  Thus, Mashantucket's failure to prove that Redican used the FOXWOODS

8

trademark also defeats the common law trademark infringement claim.  The plaintiff has not proven Count One, Three, or Five.

### B.    Counts Two and Four: Trademark Dilution

Section 1125(c) of Title 15 of the United States Code provides legal recourse for the owner of a famous mark who fears that another's use of his mark will dilute the value of that mark.  "The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution to the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection."  15 U.S.C. §1125(c)(1) [hereinafter "Dilution Act"].  A plaintiff seeking protection under the Dilution Act must prove the following elements:

> (1) its mark is famous; (2) the defendant is making commercial use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services.

Savin Corp. v. Savin Group, 391 F.3d 439, 449 (2d Cir. 2004) (internal citations omitted).  Under Second Circuit precedent, the plaintiff must prove that, "the senior mark possesses both a 'significant degree of inherent distinctiveness' and, to qualify as famous, 'a high degree of . . . acquired distinctiveness."  Id. (quoting TCPIP Holding Co. v. Haar Communications Inc., 244 F.3d 88, 97, 98 (2d Cir. 2001)).  Moreover, "[a] plaintiff cannot prevail on a state or federal dilution claim unless the marks at issue are 'very' or 'substantially similar.'"  Playtex Products, Inc. v. Georgia-Pacific Corporation, 390 F.3d 158, 167 (2d Cir. 2004).

As recommended by the Second Circuit, the court begins its analysis of the dilution claim by considering whether the FOXWOODS mark is famous.  See Savin Corp., 391 F.3d at 450.  Relevant factors to be considered when determining whether a mark is famous include the following:

> (A) the degree of inherent or acquired distinctiveness of the mark; (B) the duration and extent of use of the mark in connection with the goods; (C) the duration and extent of advertising and publicity of the mark; (D) the geographical extent of the trading area in which the mark is used; (E) the channels of trade for the goods or services with which the mark is used; (F) the degree of recognition of the mark . . .; (G) the nature and extent of use of the same or similar marks by third parties . . . .

15 U.S.C. § 1125(c).  "[T]o be famous within the meaning of the statute, the mark must have achieved a high 'degree of . . . acquired distinctiveness,' meaning that it must have become very widely recognized in by the U.S. consumer public as the designator of the plaintiff's goods [or services]."  TCPIP Holding Co., 244 F.3d at 97.

The court concludes that the FOXWOODS mark is famous.  Mashantucket registered its trademark shortly after it opened its Foxwoods Resort Casino in February of 1992.  It has consistently used the trademark FOXWOOD in connection with the operation of its casino and its related resort and services.  It has advertised and publicized its tradename extensively within the United States and internationally.  There is no evidence before the court of the use by anyone of the name Foxwoods, other than by Mashantucket, in connection with gambling or casinos.

Because the court concludes that the mark is famous, it must next consider whether Mashantucket succeeded in proving the remaining elements of the claim.  It begins by considering whether the mark is inherently distinctive.

> Distinctiveness refers to inherent qualities of a mark and is a completely different concept from fame. A mark may be distinctive before it has been used--when its fame is nonexistent. By the same token, even a famous mark may be so ordinary, or descriptive as to be notable for its lack of distinctiveness.

Sporty's Farm L.L.C. v. Sportsman's Market, Inc., 202 F.3d 489 (2d Cir. 2000) (citing

Nabisco, Inc. v. PF Brands, Inc.,191 F.3d 208, 215-16 (2d Cir.1999), overruled in part

on other grounds by Moseley v. V Secret Catalogue, Inc., 537 U.S. 418 (2003)).  The

Second Circuit recognizes four general levels of distinctiveness.  From weakest to

strongest, these are (1) "generic words," which are ineligible for trademark protection,

(2) marks that are "'descriptive'" of the mark holder's product "or its attributes or

claims," which are eligible for trademark protection only if they have acquired secondary

meaning, (3) "suggestive' marks," which "suggest the qualities or claims" of a product,

and (4) "'arbitrary'" or "'fanciful'" marks, which have no logical relationship to the

product on which they are used.  Nabisco, 191 F.3d at 215-16 (quoting Abercrombie &

Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9-11 (2d Cir. 1976) & Otokoyama Co. Ltd.

v. Wine of Japan Import, Inc., 175 F.3d 266, 270 (2d Cir. 1999).  The court finds that

the FOXWOODS mark falls in the fourth category and is inherently distinctive.  This

mark bears no logical relation to the casino or other products and services for which the

Mashantucket use this mark.  The mark is at least as "reasonably distinctive" as

Nabisco's use of the goldfish shape for bite-sized cheese crackers, which the Second

Circuit found sufficient for Dilution Act protection.  See Nabisco, 191 F.3d at 218

(holding that the lack of a logical connection between the shape and the cracker

rendered the Goldfish mark sufficiently distinctive for protection, even though it was not

so distinctive as "a purely fanciful made-up pattern or design, or a made-up word like

Kodak"). Id.

Despite the fame and distinctiveness of Mashantucket's mark, the court finds that it has not proven two key elements of its dilution claim. Mashantucket has failed to prove element (2) because, as discussed above, Redican's use of the domain name "foxwood.com" does not constitute a "use in commerce" of Mashantucket's FOXWOODS trademark.[1] Moreover, even if the court were to find that Redican had used the FOXWOODS trademark in commerce, the dilution claim would nevertheless fail, because Mashantucket had failed to prove actual dilution.

"Actual dilution is an indispensable component of a dilution claim under 16 U.S.C. § 1125(c)." Playtex Products, Inc., 390 F.3d at 167 (citing Moseley v. V Secret Catalogue, Inc., 537 U.S. 418, 433 (2003)). Actual dilution consists of "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception.'" 15 U.S.C. § 1127, cited in Moseley, 537 U.S. at 433. Such dilution may be established by proving that the junior use caused customers to "associate [the senior mark] less strongly or exclusively" with the product or services of the senior mark holder, or that it "change[d customers'] conception of" the senior product or services. Moseley, 537 U.S. at 434. While a plaintiff needs not "show the actual consequences of dilution, such as lost profits," at least some circumstantial evidence, such as consumer surveys or the simple fact that the two marks are identical, is necessary to prove actual dilution. Id. at 167-68

---

[1]The Dilution Act is codified within the Lanham Act, and the definitions in 15 U.S.C. § 1127 apply to both dilution and infringement claims.

(emphasis in the original); see also Moseley, 537 U.S. at 434.  "[A]t least where the marks at issue are not identical, the mere fact that consumers mentally associate the junior user's mark with a famous mark is not sufficient to establish actionable dilution." Moseley, 537 U.S. at 433.

There is evidence in the record, which the court credits, that at least some consumers have actually been confused by Redican's use of the foxwood.com website because of the similarity between its domain name and the Mashantucket's FOXWOODS mark.  However, the marks are not identical, so no presumption of actual dilution arises.  See Savin Group, 391 F.3d at 453 ("[A] mere similarity in the marks – even a close similarity – will not suffice to establish per se evidence of actual dilution."). Mashantucket has not proven that Redican's use of foxwood.com caused customers to "associate [Mashantucket's FOXWOODS mark] less strongly or exclusively" with Mashantucket's products or services, or that Redican's use "change[d customers'] conception of" these product or services.  Therefore, the court concludes that Mashantucket has not carried its burden of proof with respect to Count 2 for trademark dilution.

In addition to the federal dilution claim, Mashantucket also claims that Redican violated Connecticut's Dilution statute, which provides:

> The registrant of a mark which is famous in this state shall be entitled, subject to the principles of equity, to an injunction against another's use of a mark, commencing after the registrant's mark becomes famous, which causes dilution of the distinctive quality of the registrant's mark, and to obtain such other relief as is provided in this subsection. In determining whether a mark is famous, a court may consider factors including, but not limited to the following:  (1) The degree of inherent or acquired distinctiveness of the mark in this state; (2) the duration and extent of use of the mark in connection with the goods and services; (3) the duration

and extent of advertising and publicity of the mark in this state; (4) the
geographical extent of the trading area in which the mark is used; (5) the
channels of trade for the goods or services with which the registrant's
mark is used; (6) the degree of recognition of the registrant's mark in its
and in the other's trading areas and channels of trade in this state; and (7)
the nature and extent of use of the same or similar mark by third parties.
The registrant shall be entitled only to injunctive relief in this state in an
action brought under this section, unless the subsequent user wilfully
intended to trade on the registrant's reputation or to cause dilution of the
registrant's mark.  If such wilful intent is proven, the registrant shall also
be entitled to the remedies set forth in this chapter, subject to the
discretion of the court and the principles of equity.

Conn. Gen. Stat. 34-11i(c).  The above-quoted subsection was added to the statute in

1993, replacing a subsection that authorized injunctive relief on a showing of mere

"likelihood of . . . dilution."  See, e.g., Dial Corp. v. Manghnani Inv. Corp., 659 F.Supp.

1230, 1238 (D. Conn. 1987) (quoting the unamended statute).  Connecticut courts do

not appear to have expressly addressed whether or not the amended statute requires

actual dilution.  However, the court finds that the plain language of the statute, read in

light of the manner in which the text was changed in the 1993 amendment, indicates

that the Connecticut legislature intended the statute to require actual dilution.  For the

same reasons it failed to prove the federal dilution claim, Mashantucket has not proven

dilution under state law.

### C.    Count Seven:  Anticybersquatting

The Anticybersquatting Consumer Protection Act (ACPA) prevents the use of a

domain name, in bad faith with intent to profit, using a protected mark.  It provides in

relevant part:

A person shall be liable in a civil action by the owner of a mark . . . if,
without regard to the goods or services of the parties, that person (i) has a
bad faith intent to profit from that mark . . . and (ii) registers, traffics in, or
uses a domain name that (I) in the case of a mark that is distinctive at the

14

time of registration of the domain name, is identical or confusingly similar
to that mark; [or] (II) in the case of a famous mark that is famous at the
time of registration of the domain name, is identical or confusingly similar
to or dilutive of that mark . . . .

15 U.S.C. § 1125(d)(1)(A).  Application of the statute requires that the finder of fact first

determine if the mark is either distinctive or famous and, therefore, protected by the

statute.  Having already determined that the mark is both distinctive and famous, the

court turns to the question of whether Redican's domain name, foxwood.com, is

"identical or confusingly similar," 15 U.S.C. § 1125(d)(1)(A)(ii)(I), to the mark.  The

Second Circuit has concluded that "'confusingly similar' is a different standard from the

'likelihood of confusion' standard for trademark infringement adopted by this court in

Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir.1961)."  Sporty's

Farm, 202 F.3d at 497, n. 11 (internal citation omitted).  "When evaluating whether a

domain name is confusingly similar to a trademark, a district court disregards the

top-level domain name (e.g. ".com", ".org", ".net" etc.)."  Omega S.A. v. Omega

Engineering, Inc., 228 F.Supp.2d 112, 126 n.36 (D. Conn. 2002) (citing Sporty's Farm,

202 F.3d at 497-98).  Under the ACPA, "whether a domain name is confusingly similar

to a trademark is to be evaluated 'without regard to the goods or services of the

parties.'"  Id. at 126 (quoting 15 U.S.C. § 1125(d)(1)(A)).  As discussed above,

"foxwood" and "foxwoods" differ by only one letter, the final "s."  The court concludes

that Redican's foxwood.com site is confusingly similar to Mashantucket's foxwoods.com

site.

The next question is whether the defendant "has a bad faith intent to profit from

[the plaintiff's] mark."  15 U.S.C. § 1125(d)(1)(A)(I).  The ACPA lists nine factors that

may be considered when determining whether an individual has acted with bad faith

intent to profit.  These are the following:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;

> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

> (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

> (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

> (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

> (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection(c)(1) of section 43.

15 U.S.C. § 1125(d)(1)(B)(I).  The court is not limited to consideration of these factors.

"The factors are, instead, expressly described as indicia that 'may' be considered along

with other facts."  Sporty's Farm, 202 F.3d at 498.

After consideration of the record in this case and the above factors, the court

concludes that Redican did have a bad faith intent to profit from Mashantucket's mark.

First, the court finds that Redican did intend to divert confused consumers and take

them, likely through typographical error or misrecollection of the precise spelling of

Mashantucket's tradename, from Mashantucket's website to Redican's website, and

that he did that in order to attempt to profit.  Further, in this case, Redican did indeed

offer to sell or transfer the domain name to Mashantucket for approximately

$20,000,000.  Even though he "used" the domain name to collect items or places which

utilized the word "foxwood," the court has found that he did not do so in a bona fide way

for the purposes of offering goods or services.   Further, Redican obtained multiple

domain names using the word "Foxwood," including the .com one which remains in

existence and under his ownership, as well as the .net and .org domain names, which

he has let lapse.  As already discussed, the mark that is incorporated, after the

dropping of the letter "s," in Redican's domain name registration is a distinctive and

famous mark.  For all of these reasons, the court concludes that Redican had a bad

faith intent to profit from Mashantucket's mark.

Therefore, Mashantucket has proven its cybersquatting claim.

### D.    Count Six: Unfair Trade Practices

The Connecticut Unfair Trade Practices Act (CUTPA) provides that "[n]o person

shall engage in unfair methods of competition and unfair or deceptive acts of practices

in the conduct of any trade or commerce." Conn. Gen. Stat. §42-110b. To determine whether an unfair practice violates CUTPA, courts examine three factors:

> (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businessmen] . . . .

> All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three . . . .

Sporty's Farm, 202 F.3d at 501 (quoting Saturn Constr. Co. v. Premier Roofing Co., 680 A.2d 1274, 1283 (Conn. 1996) (internal quotation marks omitted)). A violation of the ACPA meets the first prong of the test for CUTPA liability. Sporty's Farm, 202 F.3d at 501. The Second Circuit held in February 2000 that a finding of bad faith intent to profit in violation of the ACPA did not equal a per se violation of CUTPA. Sporty's Farm, 202 F.3d at 501. The Second Circuit held in Sporty's Farm that, "until today's holding interpreting the new ACPA, the line between business tactics with respect to domain name use that were unfair and those that, if hard-nosed, were nonetheless legitimate was blurry." Id. However, the court finds that Redican's conduct toward Mashantucket and the public satisfies the second consideration in the CUTPA test because it was unethical or unscrupulous. Not only did Redican register a domain name that was confusingly similar to the plaintiff's mark with bad faith intent to profit through commercial use of the domain name, but he also repeatedly attempted to sell the domain name to Mashantucket.

18

In addition, the court notes that, even if the legitimacy of such tactics was unclear prior to the Sporty's Farm decision, that opinion clarified their illegality. Redican continued to use the foxwood.com domain name to sell online advertising and continued attempts to sell it to Mashantucket and others at exorbitant prices after the Sporty's Farm decision. In 2002, for example, he sent emails to Foxwoods employees offering to sell the foxwood.com domain name for roughly 20 million dollars. Ex. 65, 66. He also tried to engage two men, William Sebastian and Clay Wagner, to help him sell the domain name to Mashantucket. See Ex. 68, 69, 70-93. Thus, the court finds that Redican knew or should have known that his use of the domain name foxwood.com involved "business tactics with respect to domain name use that were unfair." Id.

With respect to the third factor, the plaintiff has not proven that Redican's actions caused "substantial injury to consumers." However, the court finds that the plaintiff has made a sufficient showing under the first two factors to support a finding that the defendant violated CUTPA.

**E.    Laches**

Redican raises the affirmative defense of laches to all claims. With one exception not relevant here,[2] the Second Circuit has not considered the application of this defense specifically to anti-cybersquatting claims. However, "[i]t is well established that the equitable defense of laches may be applied to cases brought under the Lanham Act," United States v. Milstein, 401 F.3d 53, 63 (2d Cir. 2005), and the ACPA is an amendment to the Lanham Act. Moreover, the goals of the ACPA, like the rest of

---

[2]Storey v. Cello Holdings, L.L.C., 347 F.3d 370, 392 (2d Cir. 2003) (holding that laches defense premised on failure to comply with arbitration agreement was not frivolous).

19

the Lanham Act, would appear to include protection against public confusion.  Cf.
Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 193 (2d Cir. 1996) ("[B]ecause the
Lanham Act universally protects against consumer confusion, we see no distinction
between trademark cases and misleading advertisement cases for the purpose of
laches.").

"Although laches is an equitable defense, employed instead of a statutory
time-bar, analogous statutes of limitation remain an important determinant in the
application of a laches defense."  Id. at 191.  In cases under the Lanham Act, which
contains no statute of limitations, the Second Circuit looks to "the most appropriate or
the most analogous state statute of limitations for laches purposes."  Id.  If the state
statute of limitations has run, the burden lies on the plaintiff to prove that laches should
not bar the action; if it has not run, the burden lies on the defendant to prove that the
court should bar the action under this equitable doctrine.  Id.

The record contains evidence that Mashantucket first learned of Redican's use
of the foxwood.com domain name as early as 1997, and it brought this action in 2002.
The ACPA was not in existence until 1999, but the court need not decide whether the
action could have accrued before that date, nor even what the applicable state statute
of limitations would be.  The harm of which Mashantucket complains in its ACPA claim
is ongoing, insofar as Redican maintains possession and use of the foxwood.com
domain name, and the plaintiff seeks only prospective relief.  Therefore, the violation of
the ACPA continues to accrue (or at least did continue to accrue past the date on which
the Mashantucket brought this action).  See Omega S.A. v. Omega Engineering, Inc.,
228 F.Supp.2d 112, 139 (D. Conn. 2002) (denying statute of limitations defense and

presumption of laches for these reasons and holding that "any injunction issued under the ACPA for the forfeiture, cancellation, or transfer of a domain name in current use is a form of prospective relief").  Because the statute of limitations could not have run at the time the plaintiff brought this action, the defendant bears the burden of proving his laches defense.

To "prevail on the affirmative defense of laches, a defendant must prove that it has been prejudiced by the plaintiff's unreasonable delay in bringing the action." ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic and Sports Physical Therapy P.C., 314 F.3d 62, 67 (2d Cir. 2002) (citing Conopco, 95 F.3d at 192).  "A defendant has been prejudiced by a delay when the assertion of a claim available some time ago would be inequitable in light of the delay in bringing that claim.  Specifically, prejudice ensues when a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed.  Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 192 (2d Cir. 1996).

Without deciding whether any delay in bringing this claim was reasonable, the court finds that Redican has offered no evidence to support a finding of prejudice arising from Mashantucket's delay in prosecuting the instant action.  He has not proven that he changed his position in a way that would not have occurred if the plaintiff had not delayed.   Equity therefore does not require that plaintiff's claims be barred on grounds of delay.  Therefore, the laches defense fails both as to the cyber-squatting claim and the CUTPA claim.

### F.   Unclean Hands

Redican also raises the equitable doctrine of "unclean hands" as an affirmative

defense. "As the Supreme Court has explained, '[t]he equitable powers of this court can never be exerted in behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage.'" U.S. v. Milstein, 401 F.3d 53, 64 (2d Cir. 2005) (quoting Bein v. Heath, 47 U.S. (6 How.) 228, 246-47 (1848)). Redican has not proven that Mashantucket has acted fraudulently, nor that it gained any advantage by deceit or any other unfair means. Redican's special defense fails for lack of proof.

### G. Standing

Redican also argues that Mashantucket lacks standing because "as a sovereign entity that does not submit to the jurisdiction of this court when claims are asserted against the Plaintiff, it has no right to seek redress in this court when asserting claims against others." Def.'s Ans. & Affirmative Defenses in Response to Amended Compl. at Affirmative Defenses ¶ 4. This assertion finds no support in the law. See 28 U.S.C. § 1362 (granting federal district courts original jurisdiction over "all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."); cf. Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering, 476 U.S. 877 (1986) (ruling that a state law denying standing to Indian tribes that did not submit to being sued in state court was pre-empted by federal law, in part because the federal government has an interest in ensuring that Indian tribes have access to the courts).

## CONCLUSION

The Clerk is directed to enter judgment for the plaintiff on Counts Six and Seven and for the defendant on Counts One, Two, Three, Four and Five.

The court grants in part Plaintiff's Request for Relief **[Dkt. No. 92]** and ORDERS Redican to assign the registration of the domain name Foxwood.com to Mashantucket upon condition that Mashantucket compensate Redican for his out-of-pocket costs in obtaining and maintaining the registration and in assigning the registration.  Redican is ordered to provide to Mashantucket an itemized listing of those costs, with substantiation, by December 19, 2005.  If he fails to do so, the registration shall transfer without any payment.

The Court also grants the defendant's Request for Reconsideration of Denial of Defendant's Motion for Authorization of Expense of Trial Transcript and for Leave to File Supplemental Proposed Findings of Fact **[Dkt. No. 97]**, but lets stand its previous ruling denying the authorization of court funds for a trial transcript.  It finds that for a trial as brief as this one, the cost of producing a trial transcript is not warranted.  The court finds that the errors that the defendant notes with respect to the proposed Findings of Fact are in the nature of typographical errors.  The court is well aware that the defendant's address was "foxwood.com," and not "foxwoods.com."

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 21st day of November, 2005.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge